OPINION
McKEAGUE, Circuit Judge.
Investors lost substantial amounts of their monies due to the fact that the insurance policies underlying the viatical investments in which they had invested were procured through fraud. A receiver was appointed over the entity that served as escrow agent and fiduciary for companies that marketed the viatical settlements, Liberte and Alpha. Later, the receiver’s authority was expanded such that “all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receiver[ ], if at all.” The investors sought a declaratory judgment that they, and not the receiver, had the right to pursue the arbitration claims they had filed against their broker-dealers alleging fraud and misrepresentation inducing their investments. On cross motions for summary judgment, the district court granted the receiver’s motion, authorizing him to pursue the arbitration claims and declaring that if the investors continue to pursue the litigation, any proceeds will be added to the receivership estate and will be distributed pro rata to the entire class of investors harmed. For the reasons stated below, we REVERSE.
I. BACKGROUND
In 1997, James A. Capwill and Viatical Escrow Services (“VES”) agreed to serve as escrow agents for the handling of investment funds in Liberte Capital Group (“Liberte”) and Alpha Capital Group (“Alpha”) viatical settlements.[1] Liberte and Alpha marketed viatical life insurance policies to investors, using VES to provide trustee services in handling monies received from investors to buy polices and to service the payment of premiums. Liberte Capital Group, LLC v. Capwill, 462 F.3d 543, 547 (6th Cir.2006). Liberte and Alpha purchased viatical insurance policies from insurance companies or brokerage firms, marketed the investments, and then contracted with agents to locate and resell the policies to investors. Capital Fund Leasing (“CFL”) invested funds obtained by VES in the latter’s function as escrow agent and fiduciary for companies that marketed viatical settlements. Id.
Many of the insurance policies underlying the viatical investments that Liberte and Alpha had marketed were procured through fraud. Liberte Capital, 462 F.3d at 547. For example, some of the viators misrepresented their health in order to obtain coverage. Additionally, Capwill and his escrow companies embezzled or absconded with the funds they held in escrow with which they were required to pay premiums to maintain the policies and pay out death benefits to investors upon the matched viator’s death. Accordingly, in *652 1999, Liberte sued Capwill, VES, and CFL in federal district court, alleging, inter alia, that they misappropriated escrow funds. The district court appointed a receiver “to oversee and to administer the business and assets of VES and CFL ... to take and maintain exclusive and complete custody, control and possession of all the assets belonging to VES and CFL.”[2] In November 1999, the scope of the receivership was extended
to cover all interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustee ... for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims, rescission issues, premium payment issues and anything else reasonably necessary in the management of these insurance policies.
Later, the scope of the receivership extended yet again to cover Capwill’s assets.
In December 2000, Ursula Linke and Angelo Salcedo, purchasers of Liberte viaticáis, filed arbitration claims with the National Association of Securities Dealers, Inc. (“NASD”) against Washington Square Securities, Inc. (“WSSI”), their broker-dealer, alleging that WSSI was liable for its representatives’ fraudulently inducing them to purchase Liberte viaticáis. On January 30, 2001, John Lazar, a Liberte investor who had intervened in the action, moved for class certification, and the district court granted the motion. The motion was granted in order to evaluate Liberte policies and to help oversee decisions concerning the sale or rescission of policies and the proper allocation of proceeds between Liberte and Alpha. On July 15, 2002, Linke and Salcedo filed a complaint against their broker-dealer, WSSI in federal district court. They sought a determination that the arbitration claims they had filed against WSSI before the NASD were not encompassed within the Liberte class action. In September 2002, Larry Thompson filed an arbitration claim against his broker-dealer, Carillon Investments, Inc. (“Carillon”), alleging that its representatives had fraudulently induced him to purchase Liberte investments. The receiver initially approved of these arbitration claims against WSSI and Carillon, and he stated that the arbitration proceedings did not interfere with his duties.
In 2002, however, the receiver began initiating suits to recover the lost investments and the return of commissions. On October 2, 2002, the district court stated in an order that it “is of the view that all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all.” J.A. at 1162. Along these lines, on November 7, 2002, the receivership court adopted a pro rata method of disbursement for the Liberte class. We affirmed the disbursement method in Liberte Capital Group, LLC v. Capwill, 148 Fed.Appx. 426, 437 (6th Cir.2005), but we did not discuss the import of the October 2, 2002 order.
*653 On January 28, 2008, Thompson moved to intervene in the receivership proceedings, seeking a declaration that his arbitration claim belonged to him and that it was not a part of the receivership estate. On April 22, 2003, the receivers filed a motion for an additional statement of authority. Recognizing that the matter “has developed well beyond the original conception of the parties and the Court both in terms of its breadth and complexity,” the district court ordered that the receivers “are empowered to represent and pursue the interests of investors directly in keeping with the ultimate goal of maximizing the Estates for their benefit.” JA. at 1610-11.
On June 26, 2003, the district court determined that the arbitration claims of Linke and Salcedo against WSSI were “distinct from the class claims” and granted Linke’s and Salcedo’s motion regarding arbitrability. J.A. at 1651. However, in so holding, the district court also referenced its October 2, 2002, and April 22, 2003, orders, stating that it had “modified the duties of the Receivers” and that “in addition to their general charge of marshaling assets on behalf of the receivership estates, the Receivers have and continue to file cases against, inter alia, brokerage houses, banks, and insurance agents.” J.A. at 1649-50. We affirmed the arbitrability ruling in Liberte Capital Group, LLC v. Capwill, 148 Fed.Appx. 413, 418 (6th Cir.2005).[3]
On July 21, 2003, the district court granted Thompson’s motion to intervene in the receivership proceedings. On July 23, 2003, Linke and Salcedo filed a second motion to intervene, claiming that they have a legal interest in their arbitration claim, that their ability to protect that interest after intervention is substantially impaired, and that their interest is inadequately represented by the parties already before the court. On June 9, 2004, the district court granted the motion.
On May 10, 2004, Thompson filed an intervention complaint against then-receiver Victor Javitch, seeking a determination that his arbitration claims against his broker-dealer and his broker belonged to him and not to the receiver. On June 10, 2004, Linke and Salcedo sued the receiver, requesting that the district court declare that they may bring their arbitration claim in their own names and are not required to deliver to the receiver any damages that may be awarded by the arbitrators. On July 21, 2004, the receiver filed answers and counterclaims to the complaints of Linke and Salcedo as well as Thompson (collectively “Appellants”). The receiver requested that the district court enter judgment against Appellants, and he sought a declaration that Appellants must bring their arbitration claims under his name, as the receiver, and that any proceeds recovered by them are assets of the receivership estate or that any recovered proceeds will be deducted from any entitle *654 ment they have as beneficiaries of the receivership estate. All parties moved for summary judgment on September 24, 2004.
On March 15, 2006, 419 F.Supp.2d 992, the district court granted summary judgment to the receiver and denied Appellants’ summary judgment motion. The court first reasoned that Appellants’ argument that their arbitration claims are distinct from the receiver’s civil litigation against agents and brokers is not persuasive. Second, the court stated that Appellants’ argument that the receiver lacks standing to bring the arbitration claims “is not well taken,” mainly because in a case on which Appellants relied, Javitch v. First Union Sec., Inc., 315 F.3d 619 (6th Cir.2003), this Court “did not have the precise issue presented, and did not opine, contrary to [Appellants’] assertion, that [the receiver] could not advance a suit on behalf of the investors.” J.A. at 2320.
Third, the district court considered equitable arguments. The judge noted that it is generally recognized that a receiver may bring suit to accomplish the objective of the suit for which his or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property. The court concluded that allowing Appellants to pursue an independent action “would be an affront to the equitable principles currently in place to the detriment of all Liberte investors.” J.A. at 2322. Fourth, the district court held that the receiver is not precluded from pursuing the claims based on the in pari delicto doctrine. Finally, the court stated that it was cognizant of the costs expended by Appellants thus far in litigation and that it was confident that the parties “can come to a mutually agreeable resolution” that would allow Appellants to continue to pursue the litigation, “provided the proceeds of the undertaking are added to the Receivership estate and not do violence to the pro rata ruling currently in place.” J.A. at 2325.
Appellants filed a timely appeal, contending, inter alia, that Appellee lacks standing to pursue the arbitration claims, that the district court decision violates the Takings Clause of the Fifth Amendment, that Appellee is attempting to cause Appellants to “lose the same money twice,” and that the equitable doctrine of in pari delicto bars Appellee from asserting the arbitration claims.
II. ANALYSIS
A. Standard of Review
We generally review de novo a district court’s decision to grant summary judgment. See, e.g., Lindsey v. Detroit Entm’t, LLC, 484 F.3d 824, 827 (6th Cir.2007) (citations omitted). Yet Appellee argues that abuse of discretion review is applicable to the instant case, to the extent that this case concerns a district court’s administration of the receivership, that the lower court considered a number of equitable issues, that we have noted that “[a] district court has broad powers and wide discretion in fashioning relief in an equity receivership proceeding,” Liberte Capital Group, LLC v. Capwill, 421 F.3d 377, 382 (6th Cir.2005), and that when a district court balances the equities, it “is overruled only in the rarest of cases,” Hadix v. Johnson, 182 F.3d 400, 404 (6th Cir.1999). The instant case provides no occasion for resolving this, as the district court erred under either standard of review.
Summary judgment is required “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. *655 R.Civ.P. 56(c). The court deciding a motion for summary judgment must view the evidence and draw all reasonable inferences in favor of the non-moving party. Lindsey, 484 F.3d at 827 (citation omitted).
B. The Authority to Pursue the Arbitration Claims
1. A District Court’s Powers in Presiding Over an Equity Receivership
We have recognized that although bankruptcy cases, in which Congress has set forth broad and detailed statutes to guide federal courts, comprise the vast majority of cases involving receiverships, there remains a class of cases in which federal courts may exercise their equitable powers, instituting receiverships over disputed assets in cases within the courts’ jurisdiction. Liberte Capital, 462 F.3d at 551. We have emphasized that district courts enjoy broad equitable powers to appoint a receiver over disputed assets in litigation before them. Id.; see also 13 Moore’s Federal Practice § 66.07[3] (3d ed. 2007) (“The appellate court is limited to determining whether the appointing court abused its discretion, either in the appointment of the receiver or in the administration of the receivership.”). The role of the receiver is to safeguard disputed assets, to suitably administer the receivership property, and to assist the district court in achieving a final, equitable distribution of the assets. Liberte Capital, 462 F.3d at 551. The receiver’s powers are coextensive with his order of appointment. Id. (citing 13 Moore’s Federal Practice §§ 66.02-.03 (3d ed. 1999)).
2. Standing
The district court addressed standing, albeit in a perfunctory manner. It examined the issue in light of only one case, Javitch, and concluded that because “[t]he Sixth Circuit [in Javitch ] did not have the precise issue presented and did not opine, contrary to [Appellants’] assertion that [Appellee] could not advance a suit on behalf of the investors, ... [Appellants’] position on this issue is not well taken.” J.A. at 2320.
“The appointment of a receiver is inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction.” Scholes v. Schroeder, 744 F.Supp. 1419, 1421 (N.D.Ill. 1990). “Constitutional standing is always a ‘threshold inquir[y] which this court is obligated to consider prior to asserting jurisdiction over [an] appeal.’ ” Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 922 (6th Cir.1988 (citation omitted).
To satisfy the “case” or “controversy requirement” of Article III, which is the “irreducible constitutional minimum” of standing, a plaintiff must, generally speaking, demonstrate that he has suffered “injury in fact,” that the injury is “fairly traceable” to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.
Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citation omitted). “[A] party must have a ‘personal stake in the outcome of the controversy to satisfy Article III.” Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 852 (6th Cir.2002) (citation omitted).
Here, the Appellee cannot show that the receivership entities suffered an “injury in fact” that is “fairly traceable” to the actions of WSSI and Carillon. See, e.g., Goodman v. FCC, 182 F.3d 987, 992 (D.C.Cir.1999) (“We conclude that Goodman [the receiver] lacks standing to sue the Commission. He does not represent the parties who sustained the injury of which he complains, nor is there anything preventing the parties who were injured from themselves protecting their rights.”). Nor can the Appellee show that the receiv *656 ership entities have a “personal stake” in the outcome of the controversy involving WSSI and Carillon. The mere fact that the Appellee would like to pull the arbitration proceeds into the receivership pool does not establish a “personal stake” for the receivership entities.
We have recognized the general rule that a receiver acquires no greater rights and powers to sue than the person or entity whose property is in receivership. See Javitch, 315 F.3d at 625 (“Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action.”) (citations omitted). Accordingly, when a receiver is appointed over a corporation, the receiver may only assert claims that could have been asserted by the corporation, and the receiver lacks standing to institute action on behalf of investors in the corporation. 13 Moore’s Federal Practice § 66.08[l][b] (3d ed. 2005). Indeed, Javitch emphasized that “although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors.” 315 F.3d at 627 (citing Jarrett v. Kassel, 972 F.2d 1415, 1426 (6th Cir.1992)).
A number of our cases and those from other jurisdictions apply these general rules to a context closely analogous to the instant action, compelling our conclusion that Appellee lacks standing to pursue Appellants’ arbitration claims. In Jarrett, from April 1980 until December 1981, the plaintiffs purchased contracts for the future delivery of coal from an organization named National Coal Exchange (“NCE”). 972 F.2d at 1417. The plaintiffs alleged that NCE’s owners and employees secured the sales by making misrepresentations and without having the means of acquiring the coal necessary to fulfill contractual obligations. Id. In 1981, the Commodity Futures Trading Commission (“CFTC”) filed suit against NCE, alleging violations of the Commodity Exchange Act. Id. The district court in that action appointed Erich Merrill as receiver for NCE and the other companies that were involved in the scheme. Id. at 1418. As receiver, Merrill sought and obtained permission from the federal district court in the CFTC litigation to file suit on behalf of NCE’s customers. Id. In the suit, he claimed that the officers of NCE and another entity, inter alia, conspired to defraud NCE’s customers in violation of Tennessee common law. Id.
We stated that Merrill “did not have general authority to take legal action on behalf of NCE’s customers.” Jarrett, 972 F.2d at 1426 (citation omitted). Noting that the plaintiffs (NCE’s customers) correctly stated that as corporate receiver, Merrill was charged with the authority to protect their interests in the receivership property, we nevertheless emphasized that the plaintiffs erred in “equat[ing] this limited authority with general authority to represent their legal interests.” Id. Accordingly, Merrill’s authority as receiver “was limited to preserving the property of the NCE receivership for those customers. In this regard, he had authority to sue on behalf of the receivership itself but had no authority to bring a cause of action on behalf of the individual customers. ” Id. (emphasis added). This proposition is replete in federal appellate case law. See, e.g., Goodman v. F.C.C., 182 F.3d 987, 991 (D.C.Cir.1999); Troelstrup v. Index Futures Group, Inc., 130 F.3d 1274, 1277 (7th Cir.1997); Miller v. Harding, No. 00-1245, 2000 WL 1792990, at *2 (1st Cir. Dec. 5, 2000). Thus, to the extent that Appellee serves as receiver for VES and CFL, he lacks authority to sue on behalf of investors such as Appellants, as VES and CFL had no standing to file suit for the misrep *657 reservation on the part of brokers and agents that induced the investment of Appellants and other Liberte investors.
A further review of the applicable case law reinforces this conclusion, notwithstanding (1) the fact that the receivership was later extended to cover the interests in policies funded by Liberte investors[4] and (2) the district court’s statements in its October 2, 2002 and April 22, 2003 orders that (a) it “is of the view that all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all,” J.A. at 1162, and (b) “in addition to their general charge of marshaling assets on behalf of the receivership estates, the Receivers have and continue to file cases against, inter alia, brokerage houses, banks, and insurance agents,” J.A. at 1649-50.
Our decision in Jarrett, in addition to the authority outside this Circuit cited below, undermines the second argument. In Jarrett, we held that notwithstanding the fact that the receiver sought and obtained permission from the receivership court to file suit on behalf of NCE’s customers in *658 which the receiver claimed that the officers of NCE and another entity, inter alia, conspired to defraud NCE’s customers in violation of Tennessee common law, Jarrett, 972 F.2d at 1418, the receiver had authority to sue on behalf of the receivership itself, but he had no authority to bring a cause of action on behalf of the individual customers, id. at 1426.
In Scholes v. Schroeder, 744 F.Supp. 1419, 1420-23 (N.D.Ill.1990), Steven Scholes, appointed as receiver of D & S Trading Group, Ltd., Analytic Trading Systems, Inc., and Analytic Trading Service, Inc., attempted to raise claims “framed in terms of alleged fraud on the investors.” The court reiterated the principle cited above, stating that “[fjraud on investors that damages those investors is for those investors to pursue-not the receiver. By contrast, fraud on the receivership entity that operates to its damage is for the receiver to pursue.” Id. at 1422. The court further emphasized that a district court’s authority with respect to appointing a receiver is limited by Article III and other constraints on federal court jurisdiction. Id. at 1421. Accordingly, just as the receivership court could not authorize the receiver to bring suits on behalf of entities wholly unrelated to the suit, neither could the receivership court authorize the receiver to pursue claims belonging to investors rather than to the entities in receivership. Id. More succinctly, the court held that to the extent that the orders appointing the receiver purported to confer power on him to sue directly on behalf of investors, those orders exceeded the judiciary’s power and would not be enforced. Id. at 1423.
The conclusion that the district court exceeded its appointment authority in the instant case finds support in still other federal precedent. In Marwil v. Farah, No. L03-CV-0482-DFH, 2003 WL 23095657, at *7 (S.D.Ind. Dec.11, 2003), the plaintiff, Jeff Marwil, was appointed receiver for Church Extension of the Church of God, Inc. (“CEG”) and United Management Services, Inc. (“UMS”). Id. at *1. CEG sold over $85 million in investment notes while representing that the funds from the notes would be used primarily for interest-bearing loans to local churches. Id. at *2. A subsequent investigation by the SEC revealed that the funds were actually misappropriated and were used to pay prior investors. Id. at *3. The SEC filed a securities action against CEG, UMS, and their respective presidents, Peter Grubbs and Louis Jackson. Id. The district court appointed Marwil as a receiver for CEG, ordering him “to ensure that the Investors are made whole with respect to the funds they invested with [CEG].” Id. at *3-4.
Marwil filed suit against Barry Farah, alleging, inter alia, equitable disgorgement on the grounds that the latter negligently misrepresented the value of assets sold to CEG. Marwil, 2003 WL 23095657, at *3-4. The court held that Marwil, as receiver, lacked standing to represent the investors directly. Id. at *1. The court reasoned that notwithstanding the language of the receivership court order that enabled him “to assert Causes of Action on behalf of Noteholders” and ordered him “to ensure that the Investors are made whole with respect to the funds they invested with [CEG],” id. at *3, *5, the court lacked the authority to transfer property— including causes of action — from the investors to the receiver, id. at *5. The court emphasized that to hold otherwise would extend a district court’s jurisdiction beyond the confines of Article III. See id. at *5-6.
A number of other cases stand for Scholes’ proposition that fraud on investors that damages those investors is for the investors, and not the receiver, to pursue, *659 whereas fraud on the receivership entity that operates to its damage is for the receiver to pursue, 744 F.Supp. at 1422, notwithstanding a district court’s language granting a receiver authority beyond Article III restrictions. See Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24-25 (1st Cir.1990) (holding that although the district court empowered the receiver “to prevent irreparable loss, damage and injury to commodity customers and clients,” the receiver lacked standing to sue for claims belonging to investors, such as violations of the Commodity Exchange Act); B.E.L.T., Inc. v. Lacrad Intern. Corp., No. 01 C 4296, 2002 WL 1905889, at *1-2 (N.D.Ill. Aug. 19, 2002) (holding that the receiver for a corporation had no standing to sue for, inter alia, receipt of funds fraudulently obtained, fraud, and unjust enrichment even though he was appointed “on behalf of all the creditors,” because those were claims of the creditors, not of the corporation); Scholes v. Tomlinson, Nos. 90 C 1350/6615/7201, 89 C 8407, 1991 WL 152062, at *2 (N.D.Ill. July 29, 1991) (modifying the order appointing the receiver such as “to omit any other language in the order which purports to confer authority upon the Receiver to institute actions belonging to the investors, clients, or account holders of the receivership entities” in light of the rule set forth in Scholes). Applying those principles to the instant case, Appellee’s reliance on the district court orders of October 2, 2002 and April 22, 2003 to further his contention that he has the right to pursue the arbitration claims in question, is misplaced. Case law demonstrates that the district court exceeded its authority in so ordering.
The dissent erroneously claims that “case law clearly indicates that receivers have broad powers to pursue claims on behalf of a receivership estate and individual investors, and that the scope of a receiver’s power is determined by the district court’s appointment orders.” Dis. Op. at 5. The dissent apparently believes that the scope of a receiver’s power is solely determined by the district court, no matter how broad the particular grant. The error in such a conclusion has been sufficiently detailed above and in Scholes, 744 F.Supp. at 1421. Yet we pause here to emphasize that the dissent arrives at such a mistaken conclusion only by misstating and misinterpreting our precedent and that of our sister circuits.
The dissent arrives at its conclusion that Chilcott “plainly supports an affirmance of the district court’s decision” only by misreading that case. Dis. Op. at 11. Indeed, the dissent makes such a claim notwithstanding the Chilcott Court’s express statement that “[w]e do not, however, reach or decide the standing question.”[5] 713 F.2d at 1483. Chilcott actually constitutes strong persuasive authority for our decision today, as the Tenth Circuit explicitly recognized the difference between the investors’ pre-purchase claims of fraudulent inducement to invest and the receiver’s post-purchase claims of dissipation of the commodities pool’s assets, and emphasized, in concluding that the receiver could raise the latter, that the receiver could not raise the former:[6] “the fact that the Re *660 ceiver is asserting only claims of the pool means that the investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest and for damages resulting therefrom.” Id. at 1481, 1485 (emphasis added). Furthermore, on remand, the district court so concluded, holding that the receiver lacked standing to assert the claims of deception and misrepresentation that harmed defrauded investors. Chilcott, 590 F.Supp. at 208-10. While apparently noting the pre- and post-purchase distinction made in Chilcott, see Dis. Op. at 10, the dissent nevertheless fails to recognize that same distinction or its import in the instant case; our opinion, on the other hand, is consistent with the Tenth Circuit’s statements in Chilcott, and it underscores the legal significance of that distinction.
The dissent misrepresents Fleming v. Lind-Waldock & Co., 922 F.2d 20 (1st Cir.1990), in claiming that case supports its conclusion. In Fleming, a district court order had denied standing to the receiver as representative of investors, stating that “It is axiomatic that [a receiver’s] power is derived from and limited by the order of the court appointing him.” Id. at 25. It was also the district court — not the First Circuit — that “noted that the language of the [appointment] order did not grant ... representational power to [the receiver].” See Fleming, 922 F.2d at 25. The dissent apparently believes that simply because the First Circuit set forth the procedural history of the case in Fleming, it “implicitly adopted the district court’s reasoning.” Dis. Op. at 10. That is, the dissent attempts to attribute the district court’s statements to the First Circuit, notwithstanding the fact that even a cursory review of the Fleming opinion reveals that the First Circuit never expressly or impliedly adopted, affirmed, or “not[ed] with approval,” as the dissent claims, the district court’s reasoning.[7] See 922 F.2d at 24-25. Instead, the First Circuit decided the case using the approach we employ today, citing many cases — including Chilcott — affirming “representation of the corporation and protection of its assets as the only purview of the receiver,” and concluding that “[t]he funds allegedly mismanaged ... belonged entirely to investors, not to [the entity in receivership]. Hence, Fleming as equity receiver cannot assert these investors’ claims.” Id. at 25 (emphasis added). Fleming is thus entirely consistent with our holding today.
The dissent’s reliance on McGinness v. United States, 90 F.3d 143 (6th Cir.1996), is similarly void of any persuasive value. The dissent fails to appreciate the fact that the McGinness decision was founded expressly on Ohio law. Indeed, the receiver in that case was appointed by the Lake County, Ohio Court of Common Pleas, and this Court relied on Ohio case law and Ohio statutory law in holding that the receiver was not barred from bringing the wrongful levy suit. See id. at 145-46. Specifically, this Court explicitly relied on a section of the Ohio Revised Code in *661 stating that “[t]he appointing court defines the powers of the receiver and, therefore, controls his actions.” Id. at 145. Hoping to extend McGinness to the instant case, the dissent apparently would have us, a federal court, be bound by such Ohio state law even though neither of the parties in the instant case — nor the dissent for that matter — claims that an Ohio court appointed the receiver or that Ohio law otherwise controls. By stating in conclusory fashion that we do not “properly distinguish[ ]” McGinness, Dis. Op. at 9, the dissent chooses to ignore this critical distinguishing feature of that case and thereby refuses to address this anomaly.
The dissent’s discussion of Javitch is also misleading and unpersuasive. For example, the dissent again attempts to attribute portions of McGinness to the Javitch Court, yet the Javitch decision simply describes what this Court held in McGinness, and it never adopted those statements as it own or otherwise affirmed them, as the dissent implies. Compare Javitch, 315 F.3d at 626, with Dis. Op. at 5-6. Additionally, the dissent selectively quotes Javitch, claiming that this Court “concluded that a receiver ‘could stand in the shoes of the entity in receivership, depending on the authority granted by the appointing court and actually exercised by the receiver.’ ” Dis. Op. at 6 (internal brackets and ellipsis omitted). Again, however, the dissent also ignores the fact that Javitch was simply describing McGinness. See Javitch, 315 F.3d at 626. Through this series of omissions and misstatements, the dissent attempts to give binding effect to McGinness; however, that case’s paramount reliance on applicable Ohio state law, as stated above, demonstrates that it, of course, cannot be binding here and that the dissent errs in attempting to make such an extension.
Furthermore, although the dissent makes much of the claim of the district court in the instant case that nothing in Javitch stands for the proposition that a receiver may never be authorized to pursue claims on behalf of individual investors, it is worth noting that nothing in Javitch stands for the proposition that a receiver may ever be authorized to pursue claims on behalf of individual investors. The dissent apparently believes that simply because the question was not directly answered, it is permissible for it to assume the answer in the favor of the conclusion it today posits. That point aside, the district court’s-and hence the dissent’s — statement is actually incorrect, as it ignores the suggestive language in Javitch that is consistent with our holding today. See id. at 625, 627 (emphasizing that “although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors”).
Finally, the dissent fails to explain how or why it ignores the portions of Jarrett cited above. See 972 F.2d at 1417-18, 1426. The dissent merely notes that the receiver’s actions in that case, for statute of limitations purposes, were attributable to the individual investors after the district court authorized the receiver to represent the investors. The dissent then claims that Jarrett supports its conclusion today. However, although the dissent would have us believe otherwise, this Court certainly never stated that a district court’s granting the receiver permission to sue on behalf of individual customers was proper; indeed, that was not at issue in Jarrett. The dissent’s supposition is particularly anomalous in light of the Jarrett Court’s recognition that the receiver’s authority “was limited to preserving the property of the NCE receivership for those customers. In this regard, he had authority to sue on behalf of the receivership itself but had no authority to bring a cause of action on *662 behalf of the individual customers.” Id. at 1426 (emphasis added).
Consequently, a review of the cases cited by the dissent demonstrates that it reaches its conclusion that a receiver’s powers — no matter how broad — are determined solely by the district court’s appointment orders only by misrepresenting and misstating precedent. Its approach, constituting a vast departure from the extensive case law cited above, also fails to suggest any principled reason for such a departure.
Appellee asserts two remaining arguments in support of his contention that he has standing to pursue Appellants’ arbitration claims: (1) VES had standing to pursue the claims as trustee over investor funds, and hence so does Appellee as successor-trustee, and (2) he has independent standing to pursue the claims by virtue of the district court’s assignment of investor property. Each of these arguments fails.
First, Appellee claims that “VES functioned as a trustee over investor accounts, and as such, had independent standing to assert claims relating to the trust property.” Appellee’s Br. 27. He argues that VES and Appellants thus have concurrent standing to assert the arbitration claims. In support of this claim, he cites our precedent for the proposition that trustees have standing to maintain any action to remedy an injury with respect to trust property. Appellee’s Br. 28 (quoting In re Cannon, 277 F.3d 838, 854 (6th Cir.2002)). He contends that “[s]uch broad language denotes a very loose conception of standing, permitting trustees to pursue any action that relates to property in trust.” Appellee’s Br. 28-29. He also attempts to distinguish the instant case from the cases set out above by virtue of the fact that in the former the investors have a direct interest in the property held by the receivership entities in trust, whereas in the latter investors had only a derivative interest in the receivership estate based on their equitable interest in the receivership entity itself. Accordingly, he concludes that VES, as trustee for investor funds, “had at least an equal right, and perhaps even a superior right to sue for tortious conduct resulting in the diminishment of trust property.” Appellee’s Br. 31.
For several reasons, this argument fails. First, and most importantly, it seems that Appellee misses the point entirely. Indeed, he claims that he has the right to sue for “tortious conduct resulting in the diminishment of trust property ” and that “trustees have standing to maintain any action to remedy an injury with respect to trust property.” Appellee’s Br. 28, 31 (emphasis added). Yet the instant action does not concern tortious conduct that injures or diminishes property in trust. Rather, it concerns tortious conduct that induced the decision to place property in trust. Indeed, the claims arising from that tortious conduct never were trust property. This distinction was emphasized in Knauer v. Jonathon Roberts Fin. Group, Inc., 348 F.3d 230 (7th Cir.2003). In that case dealing with a Ponzi scheme, the Seventh Circuit stated,
For our purposes, it is useful to think of Ponzi schemes as being comprised of two phases. First, the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits. While in this first stage, the schemer may generate some income for himself by charging a fee or paying himself a salary with the funds, this “sales” step is not the source of most of his Ponzi gains. After all, the Ponzi schemer is not content to enrich himself modestly by extracting fees or salaries from the funds he has solicited. Rather, the schemer realizes most of his gains by appropriating large sums of money from the solicited funds, the pace of the with *663 drawals accelerating as he is ready to disband the Ponzi entity and make off with its assets. This “embezzlement” step of the Ponzi scheme depletes the Ponzi entity of resources, which are diverted to the entity’s principal, the schemer.
Id. at 283. Having made that distinction, the court concluded that “we believe the district court was probably correct in concluding that [the receiver] had no standing to pursue the Ponzi sales claims---- Any claim relating to the fraudulent sales rightfully belongs to the wronged investors.” Id. at 234. Knauer thus makes explicit that while Appellee may be correct that he has right to sue for “tortious conduct resulting in the diminishment of trust property” and that “trustees have standing to maintain any action to remedy an injury with respect to trust property,” those propositions do not vest him with authority to assert Appellants’ arbitration claims in the instant case, as claims involving injury or diminishment of trust property are not the type of claim at issue here.[8]
Along the same lines, Appellee relies heavily on Cannon, claiming that in that case we “reasoned that an escrow agent has standing to pursue causes of action on behalf of third party trust beneficiaries.” Appellee’s Br. 32-33 (citing Cannon, 277 F.3d at 853-54). However, in the cited pages, we merely noted that “[u]nder the common law, a trustee can maintain an action in law or equity against a third person to remedy an injury with respect to trust property as if he held the property free of the trust; generally, beneficiaries of the trust cannot.” Cannon, 277 F.3d at 854 (emphasis added). He then argues that Cannon stands for the proposition that “but for the fact that the successor trustee [ ] had succeeded to his position via bankruptcy law, he would have had standing to pursue the beneficiaries’ claims directly.” Appellee’s Br. 34.
This argument suffers from the same defect as that discussed immediately above, as Appellee assumes the result by equating injuries to trust property with injuries to investors in the form of fraudulently inducing them to place their property in trust in the first instance. Another court has already rejected Appellee’s conclusion, stating that it is “extraordinarily troubling to find [the receiver’s] counsel invoking authorities from the bankruptcy area as though they stated any different principle [than the one that the receiver cannot bring causes of action that belong to their investors, as contrasted with claims that belong directly to the companies for whom the receiver is the appoint ed representative].” Scholes, 744 F.Supp. at 1421-22.
Finally, it should be noted that Appellee is similarly unconvincing in his attempt to distinguish the cases cited above on the grounds that they involve investors having only a derivative interest in the receivership estate, based on the investors’ equitable interest in the receivership entity itself, whereas the instant case involves *664 investors having a direct interest in the property held by the receivership entities in trust. Indeed, he cites no reason as to why such a distinguishing feature is of any importance. Rather, he merely concludes that “[b]ecause of this unique twist, the interests of the Receiver in this case as successor-trustee are synonymous with those of investors.” Appellee’s Br. 30. Furthermore, he even concedes that the distinguishing feature is present “in many (if not all)” of the cases cited by Appellants. Accordingly, if Appellee can explain neither why his purported distinguishing fact is relevant nor whether all of the cases cited by Appellant are even distinguishable on that ground, we see no reason to depart from the aforementioned overwhelming precedent.
Appellee’s second general argument appears to consist of two subparts: (1) the November 9, 1999 order “operated as an assignment,” such that the receivership estate includes the actual investments, thereby rendering Appellee the successor-in-interest with respect to those investors, and hence any injury to the investors’ property is an injury-in-faet to Appellee; and (2) the October 2, 2002 and April 22, 2003 orders also “operate as assignments,” assigning all ehoses in action relating to the investors’ viatical settlements to Appellee, by virtue of Appellee’s contention that “an assignment operates to confer individual creditors’ standing on a receiver, curing any standing deficiency based on lack of injury-in-fact and enabling him to pursue the creditors’ claims directly,” Appellee’s Br. 38 (citing DeNune v. Consol. Capital of North America, Inc., 288 F.Supp.2d 844, 848 (N.D.Ohio 2003)).
It should be noted that, in connection with this argument, Appellee cites no authority, save for his usual argument in which he concludes that equity receivers can lawfully perform any number of acts simply because although those acts are forbidden by the bankruptcy code, the instant case is not governed by the bankruptcy code. For these reasons, we reject the first subpart of Appellee’s argument.
Appellee’s second claim also fails. Although he relies on DeNune, that case concerned a lawful, agreed-upon assignment. 288 F.Supp.2d at 848. As Appellants point out, they neither agreed to nor received consideration in connection with any assignment of their arbitration claims. Thus, Appellee’s characterization of the district court’s orders of October 2, 2002 and April 22, 2003 as assignments of the arbitration claims is entirely unsupported by the record, and any reliance on DeNune is misplaced.
Furthermore, as stated above, overwhelming authority exists for the proposition that Appellee lacks the authority to pursue Appellants’ arbitration claims even if the district court has declared that he has such right. See, e.g., Scholes, 744 F.Supp. at 1421-22; Marwil, 2003 WL 23095657, at *5; see also Jarrett, 972 F.2d at 1418, 1426. Indeed, if Appellee’s position were correct and a district court could confer individual creditors’ standing on a receiver simply by ordering it so, such an exception would completely swallow the general rule that receivers may only sue on behalf of the entity they are appointed to represent, not on behalf of creditors and investors directly. Appellee has established no basis for such a vast expansion of a receiver’s authority or a departure from this overwhelming case law.
Finally, in discussing equitable considerations, the district court stated that the receivership court’s directives “are generally aimed at marshaling assets for the benefit of the elass/investors.” J.A. at 2321. It also noted that tracing or matching of investors to policies was not possible, and it therefore concluded that “the result of allowing [Appellants] to pursue *665 an independent action [] would be an affront to the equitable principles currently in place to the detriment of all the Liberte investors.” J.A. at 2322. Ostensibly, the district court feared that allowing Appellants to assert their pre-purchase claims could adversely affect Appellee’s post-purchase claims, disrupting the pro rata scheme set in place by the district court in such a way that “[i]ndividual recoveries could result in a windfall for some investors at the expense of their fellow investors or class members.” J.A. at 1642-43.
Our precedent compels the conclusion that the district court erred in so holding. In Jarrett, we held that the receiver did not have general authority to take legal action on behalf of the customers/investors of the entity in receivership simply because the receiver had authority to take charge of the entity’s property in order to protect the interests of the customers/investors. 972 F.2d at 1426. Furthermore, in an earlier proceeding in the instant case, we noted, in determining the propriety of the receiver’s seizure of certain assets, that “[although equity and justice are appropriate considerations for distribution, they skirt the legal basis for [the investor’s] claim that [the assets] never should have been made a part of the receivership estate.” Liberte Capital, 421 F.3d at 384. See also Chileott, 590 F.Supp. at 208-09 (rejecting a different “attenuated ‘but for’ causation argument to sidestep the failed logic of relying on misrepresentations to investors as the basis for recovering on behalf of an entity”). Furthermore, we have uncovered no case in which a court held, or even suggested, that equitable considerations could trump a district court’s exceeding its Article III powers by permitting a receiver to raise claims of investors. Neither does Appellee point us to any such authority.
In light of the overwhelming authority that not only states that Appellee has no right to pursue Appellants’ arbitration claims but also refutes the arguments that Appellee attempts to make in seeking affirmance of the district court’s holding, we are “firmly convinced that a mistake has been made,” U.S. v. Whittington, 455 F.3d 736, 738 (6th Cir.2006), and that the district court improperly applied the law, Barnes v. City of Cincinnati, 401 F.3d 729, 741 (6th Cir.2005).[9] The district court operated outside of Article III, granting excessive authority to Appellee in the name of equity. This was error, regardless of whether the standard of review is de novo or abuse of discretion.
III. CONCLUSION
For the foregoing reasons, we REVERSE the decision of the district court.[10]

. Viatical settlements allow investors to invest in another person's life insurance policy. The investor purchases the policy, or a part thereof, at a price less than the policy's death benefit. When the seller of the policy dies, the investor collects the death benefit. The investor’s return is dependent upon the seller’s life expectancy and the actual date the seller dies.

. There have been three General Receivers in this case as well as one receiver for the intervening plaintiff Alpha. When Appellants first intervened, Victor Javitch was the General Receiver. Prior to the March 15, 2006 summary judgment order, the General Receivership duties were transferred to William T. Wuliger (“Appellee”), who is also the Alpha Receiver.

. It is important to note that in that case, and in the litany of others we have heard arising out of these facts, we have left unaddressed the issue presented in this appeal, namely who has the right to pursue the arbitration claims. Indeed, we specifically stated,
[W]hether the General Receiver is entitled to bring Linke’s and Salcedo's arbitration claim or recover the proceeds of such an arbitration is a separate issue from whether Linke’s and Salcedo’s claims are arbitrable in the first instance. The parties even concede that the issue of whether the General Receiver owns the claims of individual investors is "currently being litigated in the district court.” Because only the district court’s order of June 26, 2003, regarding the question of arbitrability was referenced in the notice of appeal, we have no jurisdiction to consider in this appeal the extent of the General Receiver’s authority over the claims of individual viatical investors.
Liberte Capital, 148 Fed.Appx. at 417 n. 1.

. Moore’s Federal Practice states that “when a receiver was appointed over a fund, the receiver was the proper party to bring suit against the brokers for the alleged solicitation of investors." 13 Moore’s Federal Practice § 66.08[l][b] (3d ed. 2005) (citing Commodity Futures Trading Comm’n v. Chilcott Portfolio Mgmt., 713 F.2d 1477 (10th Cir.1983)).
In Chilcott, Thomas Chilcott had operated a Ponzi scheme, attracting nearly $80 million in investments for a commodities pool from around 400 people. 713 F.2d at 1480. A federal district court appointed James Johnson as equity receiver “to take custody and control of all assets and records, to prevent further dissipation of assets, and to prosecute or defend all actions which he, with the court’s approval, might deem necessary to protect or recover assets of Chilcott.” Id. With the district court’s approval, Johnson brought "a separate, ancillary” action against Chilcott and others who "allegedly dealt with Chilcott in soliciting investors and investing assets of the pool.” Id. The same day, Johnson filed a motion in the underlying suit by the CFTC against Chilcott, seeking an order staying all other suits against the defendants in Johnson's action. Id. The district court granted the stay. Id. The suits stayed by the order included claims by investors "based on the role of the intermediary brokers and their employees in the operation of Chilcott's allegedly fraudulent scheme and generally allege that the investors were induced to invest with Chilcott through misrepresentations.” Id. at 1481.
In reversing the district court, the Tenth Circuit noted that the district court was correct in holding that Johnson had the capacity to initiate the action for "soliciting” investors. Chilcott, 713 F.2d at 1482. However, the Tenth Circuit expressly stated that it was not addressing the issue of standing. Id. at 1482-83. Furthermore, that court held that the district court abused its discretion in staying the investors’ actions. Id. at 1487. Importantly, the court noted that “the fact that the Receiver is asserting only claims of the pool means that the investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest and for damages resulting therefrom.” Id. at 1485 (emphasis added).
Accordingly, while upon a first reading of the Moore’s Federal Practice statement quoted above one may possibly conclude that it lends support to Appellee’s position in the instant case, a thorough reading of the case used to support that quote indicates that the fact that the receivership estate was extended to cover the interests in policies funded by Liberte investors, if anything, further undermines Appellee’s position. Indeed, when the standing issue arose later in the course of the Chilcott litigation, the district court held that Johnson lacked standing to assert claims under the Commodity Exchange Act and the Securities Exchange Act because the deception and misrepresentations harmed defrauded investors, not the fund, which was actually the beneficiary of that deception. Johnson v. Chilcott, 590 F.Supp. 204, 208-10 (D.Colo.1984).

. The Chilcott Court declined to reach the standing issue because it was not decided by the district court. 713 F.2d at 1483. Consequently, to the extent that the district court addressed the standing issue in the instant case, there is no merit to the dissent's implicit conclusion that we should not address the issue. See Dis. Op. at 11.

. The dissent mischaracterizes the holding in Chilcott, claiming that "the Court expressly held that ‘the Receiver had the capacity to bring the Receiver’s action and was the proper real party in interest to bring [a] suit’ on behalf of individual investors.” Dis. Op. at 11 (quoting Chilcott, 713 F.2d at 1483). In reality, the Chilcott Court stated only that the receiver "was the proper real party in interest to bring that suit,” 713 F.2d at 1483 (emphasis added), namely the suit raising the post-purchase claims. Id. at 1481 ("the Re *660 ceiver's action ... is based on the dissipation of the pool’s assets rather than on any culpable conduct in soliciting the investments"). Accordingly, an accurate account of the Tenth Circuit’s statement reveals that it is entirely consistent with our holding today and that the dissent’s modification of that statement is simply an attempt to recharacterize it such as to assign it force unintended by the Tenth Circuit.

. If one were to accept the dissent's approach, a federal appellate court would be deemed to have "implicitly adopted" the district court’s reasoning whenever the appellate court discusses the district court's reasoning and then decides the case by employing an alternative approach. Such reasoning is clearly inconsistent with the proper interpretation of appellate precedent.

. The dissent fails to appreciate this logical distinction, instead choosing to make much of its contention that Appellee “has successfully brought both ‘pre-purchase’ and ‘post-purchase’ claims on behalf of investors in the past.” Dis. Op. at 2. However, to the extent that the three cases it cites have all been dismissed, one is left to wonder how the dissent arrived at its characterization of those claims as "successful[ ].” Indeed, there is actually evidence as to just the opposite, as Appellants claim that Appellee "has not generally sued broker-dealers on the ground that they are liable because their registered representatives recommended Liberte investments to their clients.” Appellants’ Br. 9. The dissent’s other contention fails entirely to address the pre- and post-purchase distinction and instead assumes the result, claiming that Appellee has the authority to raise the arbitration claims simply because he has filed suit alleging harm under similar theories.

. Appellee’s contention that any error here is harmless is simply incorrect. Indeed, whether Appellants are permitted to pursue their arbitration claims and retain the proceeds of those claims, rather than simply share pro rata in the proceeds of those claims if Appellee actively pursues them — which Appellants allege he has in fact not done — results in the conclusion that the district court's error was surely not harmless.

. Because we so hold on the standing issue, we do not reach Appellants' remaining arguments. Furthermore, our decision renders moot the Appellee’s motion to strike portions of the Appellant's brief and motion to strike supplemental authority.