RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DIGITAL MEDIA SOLUTIONS, LLC,

*Plaintiff*,

EMMANUEL DUNAGAN; JESSICA MUSCARI; ROBERT J.
INFUSINO; STEPHANIE PORRECA,

*Intervenor Plaintiffs-Appellants*,

v.

No. 21-4014

SOUTH UNIVERSITY OF OHIO, LLC, et al.,

*Defendants*,

MARK E. DOTTORE,

*Receiver-Appellee.*

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:19-cv-00145—Dan A. Polster, District Judge.

Argued: July 19, 2022

Decided and Filed: February 7, 2023

Before: GIBBONS, ROGERS, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellants. Robert T. Glickman, MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO., LPA, Cleveland, Ohio, for Appellee. **ON BRIEF:** Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., Eric Rothschild, NATIONAL STUDENT LEGAL DEFENSE NETWORK, Washington, D.C., for Appellants. Robert T. Glickman, Hugh Berkson, MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO., LPA, Cleveland, Ohio, Mary K. Whitmer, James W. Ehrman, WHITMER & EHRMAN LLC, Cleveland, Ohio, for Appellee. David A. Castleman, RAINES FELDMAN LLP, New York, New York, for Amicus Curiae.

---

**OPINION**

---

MURPHY, Circuit Judge.   Before the modern bankruptcy laws, federal courts had long reorganized distressed corporate debtors using an equitable remedy: the appointment of a receiver in an "equity receivership" to gather and safeguard the debtor's assets for a fair division among its creditors.  These receiverships, although rare, continue to exist today.  Receivers must administer the debtor's property in accordance with the "historical practice" of courts of equity. Fed. R. Civ. P. 66.  In this case, the receiver and several non-receivership parties entered into a settlement that was contingent on the district court's issuance of a "bar order" that would permanently bar *non-settling* third parties from pursuing personal-liability claims against *non-debtors* who were not in the receivership.  The district court approved this settlement and entered the requested bar order.  This case therefore raises the question of whether historical principles of equity allowed the court to issue an injunction that protected the non-receivership assets of non-receivership parties.  Because that type of non-debtor relief amounts to a remedy "previously unknown to equity jurisprudence," the district court lacked the authority to issue the bar order. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999).  We thus reverse and remand for proceedings consistent with this opinion.

I

The path to this appeal starts in 2017 when the Dream Center Foundation, a California non-profit corporation, formed a subsidiary named Dream Center Education Holdings, LLC.  To distinguish these two entities, we will refer to the parent as the "Foundation" and the subsidiary as "Dream Center."  Seeking to participate in higher education as part of its religious mission, the Foundation created Dream Center to purchase three university systems with locations across the country: South University, Argosy University, and the Art Institutes.  State attorneys general had recently brought consumer-protection lawsuits against the seller of these universities, a for-profit entity named Education Management Corporation, challenging its tactics in recruiting students.  After entering into consent judgments to settle those suits, Education Management fell

on financially hard times and sought to divest the universities. Dream Center planned to convert them into non-profits. Education Management and Dream Center closed their transaction in early 2018, at which point Dream Center took over management of the three university systems.

From the outset, Dream Center struggled to operate them. According to Dream Center, Education Management had overrepresented the universities' revenues by millions and underestimated their expenses by large amounts too. The universities' precarious financial position forced Dream Center to close thirty campuses in 2018.

By the end of that year, Dream Center had failed to turn things around. Unpaid landlords, vendors, and other creditors began to file a deluge of lawsuits against it. Most relevant here, four students who attended the Illinois Institute of Art (the "Art Students") brought a class-action suit in an Illinois court against this art school, Dream Center, the Foundation, and the directors and officers of these entities. According to the complaint, the Higher Learning Commission had stripped the Illinois Institute of Art of its accreditation in early 2018, but the school's officials had falsely told students for many months that it remained accredited. In July 2018, Dream Center decided to close the Institute by the end of the year. The Art Students brought fraud-based claims against Dream Center and the other defendants.

Finding itself unable to pay millions of dollars of liabilities, Dream Center faced a legal quandary. It did not want to seek bankruptcy protection because it feared that a bankruptcy filing would cut off its main source of income (funding from federal student loans) under the federal education laws. Dream Center began to consider, as an alternative to bankruptcy, the possibility of an equity "receivership" and the appointment of a receiver in one of the suits filed against it.

This possibility came to pass in January 2019 when Digital Media Solutions sued Dream Center and two of its university systems in the District Court for the Northern District of Ohio. Digital Media alleged that it had agreed to help Dream Center recruit students, but that Dream Center had not paid any of its invoices—which had grown to $252,737. Digital Media filed a motion with its complaint seeking the appointment of a receiver—Mark Dottore—to oversee Dream Center's operations. Dream Center quickly consented to the request. The district court

appointed Dottore (whom we will call the "Receiver") to operate Dream Center and many of its universities and subsidiaries. (Because the differences between Dream Center and the other receivership entities do not matter now, we will generally refer to them all as "Dream Center" for simplicity.) The district court's order gave the Receiver the right to manage Dream Center and control its property, including its cash accounts and its claims against third parties. The order also stayed all pending actions seeking to obtain Dream Center's property. In the Illinois suit, the Art Students filed a notice of stay of their claims against Dream Center (but not against the Foundation or the directors and officers).

After operating Dream Center for over two years, the Receiver decided that the potential claims against it greatly exceeded its potential assets. Among the potential liabilities, Dream Center's debts to its secured lenders had ballooned to well over $100 million. In addition, the federal government had discharged the student-loan debts of many students who attended a Dream Center university (including the Art Students). The Receiver estimated that the government's claims against Dream Center had likewise grown to over $100 million. Many other students also asserted claims against Dream Center. Dream Center lastly had failed to fund its employee health-care plan, so former employees had claims against it for unpaid medical bills.

Among the potential assets, Dream Center possessed several insurance policies with a maximum value of $60 million. This appeal concerns the primary and excess insurance policies issued by National Union Fire Insurance Company of Pittsburgh. These two policies had a maximum combined payout of $20 million. They protected Dream Center's directors and officers against liabilities and defense costs arising from covered claims brought against them for their conduct managing Dream Center. Yet the high cost of the legal defense in the existing suits (including the Art Students' suit) had already depleted the total payout available to cover any actual liability judgment.

Although the insurance policies provided coverage for liabilities against Dream Center's *directors and officers* (and, according to the Receiver, the Foundation and its directors and officers), the policies did not protect *Dream Center* itself (that is, the receivership entity). At the

same time, the Receiver believed that Dream Center had legal claims against the directors and officers that the policies would cover. He thus sent them a "confidential" demand letter raising these purported claims and proposing a settlement. Mot., R.674, PageID 15380. As far as we can tell, the Receiver has not produced this letter or identified the nature of these "claims" in any detail.

After months of negotiations, the Receiver reached a settlement with the directors and officers, the Foundation, and National Union to bring the proceeds from National Union's insurance policies into Dream Center's receivership estate. The Receiver released Dream Center's purported claims against its directors and officers and the Foundation. The directors and officers and the Foundation likewise released any claims that they had against Dream Center and the Receiver. And these parties all released National Union from any further obligations. In exchange, National Union agreed to pay $8.5 million into Dream Center's estate from the primary policy. This amount allegedly reached that policy's $10-million cap when adding in the defense costs that the directors and officers had already incurred.

Critically, the settlement hinged on the district court's entry of a "Bar Order" that would affect the rights of others *who were not parties to the agreement*. The Bar Order would "bar" third parties (including the Art Students) from pursuing their claims against not just Dream Center (the entity whose property was in receivership), but also the Foundation, the directors and officers of Dream Center and the Foundation, and National Union (individuals and entities wholly outside the receivership).

The Art Students had previously intervened in this case. Because the settlement would prohibit them from litigating their Illinois suit against parties outside the receivership, they objected to the proposed Bar Order. The district court overruled their objections. The court disagreed with the Art Students' argument that it lacked jurisdiction to bar the Art Students' claims against the directors and officers and the Foundation because these parties were not in receivership. Order, R.757, PageID 17759–62. The court reasoned that the Receiver had asserted that Dream Center "suffered an injury traceable to the actions" of the directors and officers and that this allegation could trigger Dream Center's right to obtain the insurance

proceeds by winning a judgment against them. *Id.*, PageID 17759. Yet, if the Art Students obtained a money judgment against the same directors and officers, they could obtain a right to the same proceeds. *Id.*, PageID 17760. The Art Students' suit thus implicated "assets claimed by the receivership." *Id.*, PageID 17759. The court next found it necessary to bar the Art Students' suit against the directors and officers and the Foundation because those parties would not agree to waive their rights to the proceeds if they remained at risk of third-party claims. *Id.*, PageID 17760. The court lastly decided that this ban on the Art Students' claims was fair because, as a condition of the settlement, the court required the Receiver to create a "litigation trust" that would allow the Art Students to raise their claims in the "receivership process." *Id.*, PageID 17761–62.

In a separate order, the court approved the settlement and Bar Order. It concluded that the settlement fell "within the range of reasonableness" and was "in the best interests" of Dream Center's estate. Order, R.758, PageID 17770. The court further held that the Bar Order constituted a "mandatory condition" of the settlement and that entering the Bar Order was "an appropriate exercise of the court's sound discretion to facilitate settlements[.]" *Id.*, PageID 17771.

The Art Students appeal the district court's approval of the settlement and entry of the Bar Order. Because the Bar Order qualifies as an injunction banning them from pursuing their Illinois suit, we have jurisdiction under 28 U.S.C. § 1292(a)(1). *See AmSouth Bank v. Dale*, 386 F.3d 763, 772–74 (6th Cir. 2004); *see also SEC v. DeYoung*, 850 F.3d 1172, 1179 (10th Cir. 2017); 16 Charles A. Wright et al., *Federal Practice and Procedure* § 3923, at 141 & n.2 (3d ed. 2012).

II

Courts sitting in equity have "broad powers and wide discretion" to determine the proper distribution of a receivership debtor's assets. *Liberte Cap. Grp., LLC v. Capwill*, 148 F. App'x 426, 433 (6th Cir. 2005) (citation omitted). This broad authority has led us to review a district court's approval of a settlement in an equity-receivership proceeding for an abuse of discretion. *See id.*; *see also SEC v. Stanford Int'l Bank, Ltd.* (*Lloyd's*), 927 F.3d 830, 839 (5th Cir. 2019).

Nevertheless, a district court unquestionably abuses its discretion if its decision rests on a legal mistake. *See Koon v. United States*, 518 U.S. 81, 100 (1996); *cf. Lloyd's*, 927 F.3d at 842–43. And this appeal requires us to answer a legal question: Did the district court have the power to enter the Bar Order that enjoined the Art Students' claims not just against the *receivership entities* (Dream Center and several affiliates, which again we collectively refer to as "Dream Center") but also against *third parties outside the receivership* (the Foundation and the directors and officers of Dream Center and the Foundation)? The district court had no such equitable power. The reasoning underlying that bottom-line conclusion requires us to wade into the history of equity receiverships.

A

Creditors and debtors have long faced a common problem. If a debtor lacks enough money to pay its debts, how should the creditors spread the debtor's limited assets across their many claims? Without a legal scheme to coordinate the divvying up of assets, each creditor might race to the courthouse to obtain the largest share—even if creditors could maximize the value of the debtor's assets (and give the debtor a better chance at a fresh start) through a coordinated liquidation (or reorganization). *See Brown, Bonnell & Co. v. Lake Superior Iron Co.*, 134 U.S. 530, 533–35 (1890); *Macon & W.R. Co. v. Parker*, 9 Ga. 377, 393–94 (1851). Today, the bankruptcy laws provide the main way to ensure this coordination. *See* 1 *Collier on Bankruptcy* ¶ 1.01[1], at 1-4 (R. Levin & H. Sommer eds.,16th ed. 2022). But those laws have never provided the only way. Before the Great Depression, courts more often relied on an "equity receivership" (the predecessor to a Chapter 11 bankruptcy) to reorganize distressed corporate debtors. Edward H. Levi & James Wm. Moore, *Bankruptcy and Reorganization: A Survey of Changes II*, 5 U. Chi. L. Rev. 219, 225 (1938); *see Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 218–21 (1936). Although the bankruptcy laws have now largely supplanted this method, equity receiverships remain a reorganization option. *See Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); 1 *Collier on Bankruptcy*, *supra*, ¶ 21.04[1], at 21-23.

Given a receivership's origins in equity, few laws delineate its scope. Federal Rule of Civil Procedure 66 provides merely that "the practice in administering an estate by a receiver or similar court-appointed officer must accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66; *see also* 28 U.S.C. §§ 754, 959. Rule 66 thus directs courts to rely on traditional practice to determine the powers and limits of the receiver and receivership court. By doing so, the rule codifies the Supreme Court's repeated admonition that, absent legislative change, a federal court's exercise of its equitable powers must fall within the traditional principles of equity exercised by the High Court of Chancery in England at the founding. *See Grupo.*, 527 U.S. at 318–19, 322; *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 104–07 (1945); *Gordon v. Washington*, 295 U.S. 30, 36 (1935).

Generally speaking, an equity receivership qualifies as one of these traditional practices. Judicial reliance on receivers dates back at least to sixteenth century England. *See* Ralph E. Clark, *A Treatise on the Law and Practice of Receivers* § 4, at 4, § 309, at 516 (3d ed. 1959). When a chancery court grew concerned that a party in possession of land would destroy its value for the holders of future interests in the land, the court could appoint a "receiver" to manage it. *Id.* § 4, at 4. Courts of equity gradually expanded the use of receivers to oversee the estates of indebted decedents and the assets of indebted corporations. *See* Garrard Glenn, *The Basis of the Federal Receivership*, 25 Colum. L. Rev. 434, 438–46 (1925). Well before Rule 66, therefore, federal courts had been appointing receivers to operate distressed corporations under their "general equity powers[.]" *Burnrite Coal Briquette Co. v. Riggs*, 274 U.S. 208, 212 (1927); *Leadville Coal Co. v. McCreery*, 141 U.S. 475, 477–78 (1891); *see also* Clark, *supra*, § 702, at 1302–04 (citing cases).

In a traditional equity suit by a creditor against a debtor, a federal court needed to ensure itself of several types of "jurisdiction." Most obviously, the court needed to have subject-matter jurisdiction over the creditor's underlying claims. Clark, *supra*, § 701, at 1296–97. These claims had to be distinct from its mere request for a receiver because that request qualified as an equitable remedy rather than a substantive right. *Id.* Since the creditor typically sought to raise a state-law claim on some sort of debt, the creditor and debtor often had to be citizens of different

states so that the federal court could exercise diversity jurisdiction. *See id.* §§ 702.1–702.2, at 1304–07; *Gordon*, 295 U.S. at 35–36; *Pennsylvania v. Williams*, 294 U.S. 176, 180–81 (1935).

The court next needed to have jurisdiction over the defendant and property at issue (that is, "personal" or "in rem" jurisdiction). Clark, *supra*, § 701, at 1296. In a receivership, the court would exercise "quasi-in rem" jurisdiction over the corporate debtor and its property. *See Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935); Clark, *supra*, § 46, at 4849, § 70, at 83–84; *cf. Shaffer v. Heitner*, 433 U.S. 186, 199 (1977). The court compelled the debtor (an entity) to turn over its property to the receiver. *See Alexander v. Hillman*, 296 U.S. 222, 237–38 (1935); Clark, *supra*, § 70, at 83. By doing so, the court obtained *exclusive* jurisdiction over the debtor's res (the property) and sole authority to determine who should possess it. *See Wabash R.R. Co. v. Adelbert Coll. of W. Rsrv. Univ.*, 208 U.S. 38, 5455 (1908); *Field v. Kansas City Refin. Co.*, 296 F. 800, 804 (8th Cir. 1924). Traditional equity practice gave the receiver jurisdiction over only the debtor's property located in the specific district court's geographical boundaries, necessitating the need for ancillary receivers in other courts where the debtor held property. *See* Clark, *supra*, §§ 18, at 20, § 314, at 523–24, § 591(b), at 963–64; *Booth v. Clark*, 58 U.S. 322, 331–34 (1854). But Congress eventually did away with this rule by giving receivers "complete jurisdiction and control of all" the debtor's property, including property "in different districts[.]" 28 U.S.C. § 754.

Even if the court had subject-matter and quasi-in-rem jurisdiction, it lastly needed to have what the Supreme Court described as "equity jurisdiction." *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 500 (1923). Given the Court's recent caution about the mistaken use of the word "jurisdiction" (which concerns a court's power to adjudicate a case), we doubt the Court would say "equity jurisdiction" today. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848–50 (2019); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–62 (2010). The phrase does not implicate the "power of a federal court to act" but instead "a question only of the merits" about whether a "court of equity" may grant relief. *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 69 (1935). The court could exercise its powers only in a way that comported with "the accepted principles of equity[.]" *Gordon*, 295 U.S. at 36. Historically, for example, ordinary creditors like Digital Media could not invoke a court's equitable power to appoint a receiver

because these creditors had adequate remedies at law; only judgment creditors (those who had won a judgment) could seek this relief. *See Harkin v. Brundage*, 276 U.S. 36, 52 (1928); *cf. Grupo*, 527 U.S. at 319–20. But the Supreme Court eventually allowed ordinary creditors to request a receiver when the debtor consented (as Dream Center did). It reasoned that a party could waive the claim that a court lacked "equity jurisdiction" (unlike the claim that it lacked subject-matter jurisdiction). *In re Metro. Ry. Receivership*, 208 U.S. 90, 109–10 (1908); Clark, *supra*, § 188, at 288–92, § 733, at 1341.

If the receivership court had jurisdiction, both the receiver and the court obtained a variety of powers (which came with limits). Start with the receiver's powers. The receiver stood in the shoes of the corporate debtor, taking possession of all its property and becoming its manager. *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 798–99 (6th Cir. 2009); *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 625–27 (6th Cir. 2003); Clark, *supra*, § 765.1, at 1419–20; James F. Gluck & August Becker, *The Law of Receivers of Corporations Including National Banks* §§ 41–42, at 165–76 (2d ed. 1896). A law governing receiverships today thus provides that a receiver must "manage and operate" the property "according to the requirements of the valid laws of the State in which such property is situated[.]" 28 U.S.C. § 959(b). Yet a receiver needed to take the good with the bad. This "'stand-in-the-shoes' doctrine" meant that the receiver did not obtain *superior* rights to the debtor. *Wuliger*, 567 F.3d at 798 (citation omitted); Clark, *supra*, § 362, at 619–20, § 765, at 1419. So when a debtor had committed a fraud, the receiver was subject to any defenses that would have applied against it for this fraud. *See Rankin v. City Nat'l Bank of Kansas City*, 208 U.S. 541, 546 (1908); *Wuliger*, 567 F.3d at 798–99. The debtor's contracts likewise continued against the receiver. *See* Clark, *supra*, § 560, at 902; *Javitch*, 315 F.3d at 625.

These same rules applied to causes of actions (a form of property) that the debtor held against third parties. As the "possessor" of these claims, the receiver could litigate or liquidate them. *See* Clark, *supra*, §§ 365–66, at 623, §§ 769–70, at 1424–25; *Porter v. Sabin*, 149 U.S. 473, 478–80 (1893). Yet if a debtor could not assert the cause of action because a different party held the right to it, the receiver likewise could not raise it. *See Lloyd's*, 927 F.3d at 841; *Javitch*,

315 F.3d at 625. So, for example, a receiver lacked the power to pursue claims that a debtor's customers held against third parties. *See Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992).

Turn to the receivership court's power. It could issue a variety of injunctions to protect its exclusive jurisdiction over the debtor's property. *See Liberte Cap. Grp.*, 462 F.3d at 551. Because the court delegated control of this property to the receiver, it might enjoin creditors from suing the receiver for possession of the property based on claims that arose against the debtor before the receiver's appointment. *See id.* (citing *Barton v. Barbour*, 104 U.S. 126, 128 (1881)). The court likewise might enjoin judgment creditors from executing on the property or seeking to possess it by other means. *See Riehle v. Margolies*, 279 U.S. 218, 223 (1929); Clark, *supra*, § 71, at 88–91, § 543, at 880–81. And the court could compel a party to return the debtor's assets when the party had taken them after notice of the receivership. *See Bien v. Robinson*, 208 U.S. 423, 427 (1908). Yet, having barred creditors from obtaining the debtor's property through the ordinary means, the court had to allow them to present their claims to the receiver or to intervene in the receivership case. Clark, *supra*, § 71, at 880–81, § 577.2, at 931; *see, e.g.*, *Alexander*, 296 U.S. at 239–43.

If, however, a creditor's conduct did not affect a court's control of the property, the court could not enjoin the conduct. A court thus could not issue an injunction that "extended so far as to protect assets outside the receivership." *Greenbaum v. Lehrenkrauss Corp.*, 73 F.2d 285, 286 (2d Cir. 1934). In addition, the Supreme Court held that a receivership court could not enjoin a creditor's suit against the debtor *itself* if the suit sought only an in personam judgment. *See Geig v. March Co.*, 1995 WL 376717, at *4 (6th Cir. June 22, 1995) (per curiam) (citing *Morris v. Jones*, 329 U.S. 545, 549 (1947); *Riehle*, 279 U.S. at 224); *see* 13F Charles A. Wright et al., *Federal Practice and Procedure* § 3631, at 291–96 (3d ed. 2009); Clark, *supra*, § 610, at 1002–03. The Court reasoned that a suit imposing *personal* liability on the debtor would not interfere with the receivership court's control of its *property*. *See Riehle*, 279 U.S. at 223–24; *Dickinson v. Universal Serv. Stations, Inc.*, 100 F.2d 753, 757 (9th Cir. 1938); *Chi. Title & Tr. Co. v. Fox Theatres Corp.*, 69 F.2d 60, 61–62 (2d Cir. 1934). A winning creditor could subsequently bring this personal judgment to the receivership court in an attempt to collect from the debtor's property, and that court generally had to respect the judgment as to the amount owed.

*See Riehle*, 279 U.S. at 224–28; Clark, *supra*, § 71(d), at 91–92, § 542, at 877–80.  Because these judgments might affect the debtor's estate, the receiver had an incentive to defend against suits in the non-receivership venue.  *See, e.g.*, Clark, *supra*, §§ 560–61, at 903–04.

B

This case requires us to decide whether these traditional rules of equity allowed the district court to issue its Bar Order prohibiting the Art Students from litigating their fraud claims against non-receivership entities and individuals (the Foundation and the various directors and officers) in their Illinois suit.  In normal circumstances, most lawyers would describe this Bar Order as unprecedented.  *Cf. In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002).  It is not every day that a court permits two parties to enter into a contract that "dispose[s] of the claims of a third party . . . without that party's agreement."  *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986).  Unless traditional equitable principles permitted this unique form of relief, the district court had no ability to grant it in the name of "equity."  *See Grupo*, 527 U.S. at 332.  The Receiver offers two reasons why traditional principles allowed for the Bar Order.  He argues that the Art Students' claims against the directors and officers and the Foundation are "derivative" of the Dream Center's own claims against those defendants, which would make them subject to his settlement power.  Even if the claims did not belong to Dream Center, the Receiver next argues, the district court could enjoin them because they interfered with its jurisdiction over Dream Center's property (the National Union insurance proceeds).  He is mistaken on both counts.

1. *Did the Receiver have the authority to settle the Art Students' claims?*

The Receiver asserts that the Art Students' claims against the directors and officers and the Foundation are really Dream Center's claims.  Because the Receiver took control of Dream Center's property, this argument goes, he had full authority to settle the claims.  We disagree because the Art Students, not Dream Center, "owned" the claims that they sought to raise.

When asking whether a receiver may pursue and settle claims that other parties want to litigate, courts often describe this question as concerning a receiver's (or bankruptcy trustee's) "standing" to sue.  *See Lloyd's*, 927 F.3d at 841; *DeYoung*, 850 F.3d at 1180–82; *Liberte Cap.*

*Grp., LLC v. Capwill*, 248 F. App'x 650, 655–56 (6th Cir. 2007); *see also Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416, 416 (1972). What type of standing do the courts mean? Some cases (but not others) recite the three-part standing test required for a plaintiff to establish an Article III case: injury, causation, and redressability. *Compare DeYoung*, 850 F.3d at 1180; *and Liberte Cap. Grp.*, 248 F. App'x at 655, *with Javitch*, 315 F.3d at 625; *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 898 (5th Cir. 2019); *and Scholes v. Lehmann*, 56 F.3d 750, 753–54 (7th Cir. 1995). But this case does not raise an Article III standing problem. Dream Center's insolvency qualifies as an obvious injury; the Receiver alleges that Dream Center's directors and officers caused this insolvency (even if he has kept confidential Dream Center's claims against them); and a money award would redress the injury. *See DeYoung*, 850 F.3d at 1181–82. Yet the Art Students respond that the Receiver's standing to sue for injuries to *Dream Center* says nothing about his ability to raise *their* claims.

Other cases thus suggest that this question is one of "third-party standing." *See Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999). Plaintiffs generally may raise only their own legal rights, but they may assert the rights of others in certain circumstances as long as they have suffered their own Article III injury. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 539 (6th Cir. 2021) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 707–09 (2013)). To establish such third-party standing absent statutory authorization, plaintiffs must show both that they have a "'close' relationship" with the person that possesses the right and that some "hindrance" limits that person's ability to assert it. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). Here, however, no obstacle restricts the Art Students' ability to protect their own rights; indeed, they had filed their suit before the district court appointed the Receiver. *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208–09 (6th Cir. 2011) (en banc). So the Receiver does not attempt to meet this third-party-standing test. He instead argues that the Art Students' claims are "derivative of" Dream Center's now-settled claims—a fact that would mean that the Art Students seek to assert Dream Center's rights rather than the other way around. Appellee's Br. 37.

The real question in this case thus concerns who "owns" the claims that the Art Students seek to litigate against the directors and officers and the Foundation? Or, as we said in *Jarrett*,

it asks whether the Receiver has the "authority" to sue on those claims under traditional principles of equity because they belonged to Dream Center, the receivership entity, even when pursued by the Art Students. 972 F.2d at 1426. This "ownership" question has nothing to do with any federal "standing" doctrine; it concerns a "merits" issue about the parties' respective legal rights under the state law that they seek to enforce. *Grede v. Bank of New York Mellon*, 598 F.3d 899, 900 (7th Cir. 2010). As we and many other courts have recognized in the bankruptcy context, "[w]hether a creditor has sole right to a cause of action is determined in accordance with state law." *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997); *see also In re Educators Grp. Health Tr.*, 25 F.3d 1281, 1284 (5th Cir. 1994); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987).

Two analogies—one that helps the Receiver, the other that helps the Art Students—clarify the nature of this ownership debate. As for the analogy that helps the Receiver, shareholders commonly bring "derivative" suits against a corporation's directors and officers for alleged misconduct. In a traditional shareholder derivative suit, a shareholder may sue the corporation's directors and officers for a mismanagement injury to the corporation when the corporate entity itself has refused to sue. *See* Fed. R. Civ. P. 23.1; *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 528–32 (1984). Even when pursued by a shareholder, the suit seeks "to enforce a corporate cause of action" and recover funds that "belong to the corporation[.]" *Ross v. Bernhard*, 396 U.S. 531, 534, 538 (1970). The corporation's ownership of these claims has relevance for equity-receivership proceedings. That corporate ownership gives the receiver the power to litigate the claims under the traditional principle of equity that authorizes the receiver to control the debtor's property. *See Porter*, 149 U.S. at 478–79; 7C Charles A. Wright et al., *Federal Practice and Procedure* § 1834, at 163–64 (3d ed. 2007) (citing cases).

As for the analogy that helps the Art Students, creditors of, or investors in, a corporation that allegedly engaged in a fraud often sue third parties or corporate insiders for injuries to the creditors or investors. *See, e.g.*, *Caplin*, 406 U.S. at 417–20, 432 & n.21; *Liberte Cap. Grp.*, 248 F. App'x at 652. Some investors may, for example, sue brokers who made false statements to them to convince them to invest. *See Liberte Cap. Grp.*, 248 F. App'x at 652; *cf. Educators Grp.*

*Health Tr.*, 25 F.3d at 1285. This type of suit seeks to recover for *personal* injuries to the investors based on their *individual* causes of action. *See Liberte Cap. Grp.*, 248 F. App'x at 658–59. The investors' personal ownership of these claims again has relevance for equity-receivership proceedings. This personal ownership means that the receiver lacks the authority to litigate them under the traditional principle of equity that bars a receiver from pursuing claims owned by others. *See id.* at 656–57; *Eberhard v. Marcu*, 530 F.3d 122, 133–35 (2d Cir. 2008); *Troelstrup v. Index Futures Grp., Inc.*, 130 F.3d 1274, 1277 (7th Cir. 1997); *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990); *cf. Virginia-Carolina Chem. Co. v. Floyd*, 74 S.E. 465, 466–67 (N.C. 1912). The Supreme Court has made this same point concerning the authority of a bankruptcy trustee, who may not pursue claims personally owned by a bankrupt entity's creditors. *See Caplin*, 406 U.S. at 428–29. Because a receiver lacks the authority to litigate the claims, the receiver "equally" lacks the authority "to settle them" without the consent of the claims' owners. *Lloyd's*, 927 F.3d at 841 (quoting *DSQ Prop. Co. v. DeLorean*, 891 F.2d 128, 131 (6th Cir. 1989)).

Unfortunately for the Receiver, the Art Students' claims here fit squarely within the second camp. The Art Students are not shareholders of Dream Center seeking to sue its directors and officers and the Foundation for injuries that those defendants directly caused Dream Center (and indirectly caused them by reducing the value of their investments). They are customers of Dream Center (more specifically, of the Illinois Institute of Art—one of the affiliated receivership entities) suing the directors and officers and the Foundation for fraudulently selling them a defective education. The Art Students allege that these defendants wrongly conspired for months to hide their school's loss of accreditation and thereby prevented them from transferring to an accredited school. Ill. Compl., R.35-2, PageID 320–29. Among other injuries, the Art Students allege that their school's loss of accreditation has rendered their degrees practically worthless and harmed their long-term employment prospects. *Id.*, PageID 318, 334–35, 337, 339–40.

These claims allege injuries directly incurred by the Art Students, not injuries that they incurred indirectly as a result of a harm that the directors and officers caused Dream Center. In that respect, their claims resemble those that we considered in *Jarrett*. There, customers of a

coal supplier alleged that they bought contracts for the future delivery of coal based on misrepresentations that the supplier could obtain the coal. 972 F.2d at 1417. After the supplier went into receivership, the customers sued various defendants associated with the supplier to recover the losses that they incurred as a result of the misrepresentations. *Id.* When we considered whether the customers could rely on the receiver's diligence for purposes of rebutting a statute-of-limitations defense, we recognized that the receiver had not been acting on their behalf during the receivership and that he could not have pursued the fraud claims that they wished to litigate. *Id.* at 1426. Similar analysis applies here. The Art Students allege that, like a broker who lied to customers to convince them to invest in a fraudulent corporation, the various defendants "intentionally misrepresented" the school's accreditation status "*to them*" to keep them from transferring to another school. *Educators Grp. Health Tr.*, 25 F.3d at 1285; *see Liberte Cap. Grp.*, 248 F. App'x at 652, 658–59.

Considering this question from the opposite perspective leads to the same result: Could Dream Center have brought the Art Students' fraud claims against the directors and officers and the Foundation before the Receiver took control of it? *See Liberte Cap. Grp.*, 248 F. App'x at 656. It could not. The Art Students allege that Dream Center itself participated in the fraud. Under the Receiver's view, then, a joint tortfeasor could sue an accomplice for the harms that they caused a third party and then "settle" with the accomplice to eliminate their liability to the third party. That is quite wrong. *Cf. Caplin*, 406 U.S. at 429–30; *Troelstrup*, 130 F.3d at 1277. Perhaps Dream Center could have had a contribution claim against the directors and officers to the extent that their conduct caused it to incur its liability to the Art Students. But that type of contribution claim would be derivative of the Art Students' primary claims. *See Caplin*, 406 U.S. at 429–30; *S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co.*, 678 F.2d 636, 645 (6th Cir. 1982).

In response, the Receiver initially cites his declaration in support of the Bar Order as the primary "evidence" showing that the Art Students' claims belonged to Dream Center. In that declaration, he asserted that "my professionals and I" had determined that "we" had several claims against the directors and officers, including "Accreditation Claims" in which students allege that the directors and officers had failed to inform them that their school had lost

accreditation. Dottore Decl., R.742, PageID 16773–74. He suggested that he made these claims part of the settlement with the directors and officers, the Foundation, and National Union. But the Receiver's *ipse dixit* that the Art Students' claims are Dream Center's does not make them so. The Receiver cannot change the underlying ownership status of a cause of action (a form of intangible property) through his mere say-so. And to the extent he believes that he "settled" the Art Students' claims on their behalf, he lacked the power to do so. *See DSQ Prop.*, 891 F.2d at 131.

The Receiver next argues that the directors and officers engaged in negligent conduct in operating the university systems and that this negligence harmed Dream Center by leading to its demise. Appellee's Br. 39. Because the directors and officers harmed Dream Center too, his argument goes, the Art Students assert the same cause of action against those defendants. This argument is also mistaken. Just became the same defendants allegedly cause harms to two parties does not make those harms the same. And the Art Students' injuries (reduced job prospects, among other harms) have little in common with Dream Center's injury (its insolvency).

The Receiver lastly relies on two out-of-circuit decisions. *See Zacarias*, 945 F.3d at 898; *DeYoung*, 850 F.3d at 1181–82. Neither decision assists the Receiver. In *DeYoung*, a third-party administrator managed individual retirement accounts that investors held at the same bank, and its president stole $24 million from these accounts. 850 F.3d at 1175. After this theft came to light, a district court appointed a receiver for the third-party administrator. *Id.* at 1176. Both the investors and the receiver alleged that the bank had violated its contractual and fiduciary duties by failing to detect the theft. *Id.* at 1182. The Tenth Circuit upheld the receiver's settlement of these claims with the bank and the district court's bar order preventing the investors from raising the same claims against it. *Id.* at 1176–79. In that case, however, the receiver and investors pursued the bank on the same contract and fiduciary-duty claims and sought recovery for the same injury (the stolen funds), so allowing them both to sue would have resulted in a double recovery. The Art Students, by contrast, seek to recover for personal harms that are distinct from Dream Center's insolvency. To the extent that our reasoning differs from *DeYoung*'s, that case reinforces why courts should avoid the "standing" label for this issue. *DeYoung* focused *solely*

on whether the receiver had Article III standing to sue the bank, concluding that the third-party administrator's insolvency qualified as an adequate injury in fact. *Id.* But just because a defendant has injured a receivership entity does not mean that the entity "owns" all potential causes of action against that defendant. In that respect, *DeYoung* nowhere asked the question that we find critical: Did the investors or the third-party administrator "own" the contract and fiduciary-duty claims that they sought to pursue against the bank? Because *DeYoung* did not even ask this question, the decision provides us with no help in how to answer it in this case.

*Zacarias* does not help the Receiver for the same reasons. That case involved the infamous Ponzi scheme run by Robert Allen Stanford and related entities. 945 F.3d at 889. The receiver of these entities settled claims against insurance brokers who allegedly facilitated the fraud, but the settlement hinged on a bar order preventing investors from filing separate suits against the brokers to recover their investment losses. *Id.* at 889–94. The Fifth Circuit upheld this bar order. Like *DeYoung*, the majority opinion in *Zacarias* found that the receiver and investors sought recovery for the same injury: the investment losses that the brokers had caused. *Id.* at 897–900. The Art Students and Dream Center here have distinct injuries. Like *DeYoung*, moreover, *Zacarias* nowhere considered the key question: Which party (the investors or the receivership entities) would have possessed the right to assert their respective causes of action outside the receivership context? *See id.* at 902. *Zacarias* thus also does not help us answer this question.

All told, the Art Students seek to recover on individual claims for personal injuries. These claims belong to them, not Dream Center. So they, not the Receiver, had the right to pursue them.

2. *Could the district court issue the Bar Order because the Art Students' claims interfered with the court's exclusive control of receivership property?*

Unable to settle the Art Students' claims on the ground that those claims belonged to Dream Center, the Receiver falls back on the argument that the claims interfered with the district court's exclusive jurisdiction over Dream Center's *other* property—the proceeds from the National Union insurance policies. The Receiver alleges that the court could issue the Bar Order

to stop this interference. We disagree because the order conflicts with traditional principles of equity.

At the outset, we highlight two questions that we need not decide. Question One: Are the proceeds from the National Union insurance policies Dream Center's "property"? Nobody disputes that the *policies* belonged to Dream Center. But the *proceeds* primarily protected others—most notably, its directors and officers. Courts have debated when these proceeds from directors-and-officers insurance fall within a debtor's bankruptcy estate. *See In re Cont'l Airlines*, 203 F.3d 203, 216–17 & n.16 (3d Cir. 2000) (citing cases). This property question raises a fact-intensive issue that depends on the specific terms of a specific policy under a specific state's contract law. *See In re Camall Co.*, 16 F. App'x 403, 406–07 (6th Cir. 2001); 28 U.S.C. § 959(b). Here, the Receiver claims these proceeds as Dream Center's property because the directors and officers could use them to pay a judgment that Dream Center obtained against them. Yet National Union's primary policy excluded coverage for any "deliberate fraudulent act" found to exist after a "final, non-appealable adjudication[.]" Ins. Pol'y, R.737-6, PageID 16587. Perhaps for this reason, the Receiver indicated that the directors and officers had acted in a "negligent" manner. Dottore Decl., R.742, PageID 16772. At the settlement-approval hearing, however, his counsel suggested that the Receiver claimed that they had acted fraudulently. *See* Hr'g Tr., R.751, PageID 17520–21. And the district court's order rejecting the Art Students' objections relied on this theory that the directors' and officers' "fraudulent conduct" had harmed Dream Center. Order, R.757, PageID 17759. Be that as it may, the Art Students do not adequately raise this complex contract-law question. So we will simply assume that the proceeds belonged to Dream Center.

Question Two: Did the Art Students' lawsuit against the directors and officers and the Foundation affect these policy proceeds? As noted, the primary policy did not provide coverage if a final judgment found that the directors and officers had committed a "fraudulent act" in managing Dream Center. Ins. Pol'y, R.737-6, PageID 16587. The Art Students thus disavow any right to touch these proceeds because their suit asserts fraud claims. As the Receiver points out, however, National Union advanced the defense costs for this suit out of the primary policy—so defense of the suit was continuously diminishing the total funds available given the

policy's $10-million cap.   Although the Art Students respond that the directors and officers would have to repay these costs if a court found them liable for fraud, Ins. Pol'y, R.737-6, PageID 16593, we will take it as a given that their suit affected this Dream Center "asset" (the proceeds) because of the defense costs that National Union had been paying.   In sum, we will assume both that the National Union policy proceeds are property of Dream Center's estate and that the costs to defend against the Art Students' suit negatively affected this property.

Given these two assumptions, the district court may well have possessed the power to issue a narrow injunction prohibiting the directors and officers and the Foundation from paying their defense costs out of Dream Center's insurance proceeds—just as it might have enjoined them from paying those costs out of Dream Center's bank accounts.   But the Bar Order, in enjoining all personal-liability claims against Dream Center's directors and officers, went far beyond this narrow property-protective injunction.   The district court exceeded "the accepted principles of equity" in granting this order, *Gordon*, 295 U.S. at 36, because it represents a remedy "previously unknown to equity jurisprudence," *Grupo*, 527 U.S. at 332.

For one thing, a receivership court with *quasi-in rem* jurisdiction over a debtor and the debtor's assets traditionally lacked the power to enjoin *in personam* suits.   *See Riehle*, 279 U.S. at 223–28; *see also Penn Gen. Cas.*, 294 U.S. at 195.   An in personam judgment against defendants would determine only their "personal liability" to a plaintiff and would not "involve the possession or control" of the debtor's property.   *Kline v. Burke Constr. Co.*, 260 U.S. 226, 230 (1922); Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten* Callaway v. Benton *Case*, 72 Am. Bankr. L.J. 1, 17–18 (1998).   The Supreme Court thus held that a "court sitting in equity" lacked the power to enjoin in personam claims even against a receivership debtor.   *Riehle*, 279 U.S. at 228; *Chi. Title & Tr.*, 69 F.2d at 62.   And here, the Art Students did not file an in rem action asserting claims to the policy proceeds.   They filed an in personam action asserting claims against the directors and officers and the Foundation.   If a court lacked the power to enjoin in personam claims against a *receivership debtor*, it would make no sense to allow a court to enjoin in personam claims against *non-receivership entities*.

For another thing, a receivership court traditionally could issue injunctions to protect only the debtor assets that its creditors could execute upon. The court thus lacked any equitable power to "protect assets outside the receivership." *Greenbaum*, 73 F.2d at 286; *see Lloyd's*, 927 F.3d at 841. This conclusion appears to have been an obvious one under traditional equity principles. We could find very few cases involving a receivership court attempting to protect non-debtor assets, and the cases with these facts summarily rejected this idea. In *Greenbaum*, for example, a receivership court enjoined a state officer's suit to liquidate an affiliate of the receivership debtor, even though the debtor's creditors had not included this affiliate's assets in the receivership. *Greenbaum*, 73 F.2d at 286–87. The Second Circuit found it "amazing" that the receivership court believed it could enjoin suits seeking to obtain non-debtor property, describing this injunction as "contrary to the whole theory of an equity receivership." *Id.* at 287. The Bar Order here suffers from the same flaw. As in *Greenbaum*, it protected not just assets in the Dream Center receivership (the insurance proceeds) but also assets that fell wholly outside the receivership (all other property possessed by the directors and officers and the Foundation).

Our bankruptcy precedent confirms that the Bar Order cannot stand on traditional equity principles. In the 1980s, courts overseeing the bankruptcies of debtors facing mass tort claims began to approve reorganization plans that permanently enjoined third parties from pursuing claims against non-debtors. *See* Brubaker, *supra*, at 2–5; *see, e.g.*, *In re A.H. Robins Co.*, 880 F.2d 694, 701–02 (4th Cir. 1989); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 n.4 (2d Cir. 1988). Since then, circuit courts have disagreed over whether the bankruptcy laws ever allow a bankruptcy court to enjoin creditors (like the Art Students) from pursuing claims against non-debtors (like the directors and officers) as part of the reorganization plan of a debtor (like Dream Center). *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1077–78 & nn.6–7 (11th Cir. 2015).

Some circuits hold that courts lack any general power to extinguish a third party's claims against non-debtors—at least when those claims arose before the bankruptcy. *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 436–38 (5th Cir. 2022); *In re W. Real Est. Fund, Inc.*, 922 F.2d 592, 600–02 (10th Cir. 1990) (per curiam); *In re Am. Hardwoods, Inc.*, 885 F.2d 621, 625–26 (9th Cir. 1989). They find themselves constrained by a bankruptcy law indicating that

the discharge of a debtor's debt "does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e); *see Highland*, 48 F.4th at 437. They add that only one specific law (adopted in 1994) authorizes this non-debtor relief, but it narrowly applies only in asbestos cases.  11 U.S.C. § 524(g); *see In re Lowenschuss*, 67 F.3d 1394, 1402 n.6 (9th Cir. 1995).

Conversely, we and other circuits find legislative approval for injunctions barring claims against non-debtors in 11 U.S.C. § 105(a).  Section 105(a) permits a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out" the bankruptcy laws.  *Id.*  These courts read this text as providing a "broad grant of authority" to issue injunctions, including non-debtor releases.  *Dow Corning*, 280 F.3d at 656–58; *Seaside Eng'g*, 780 F.3d at 1078–79; *In re Airadigm Commc'ns., Inc.*, 519 F.3d 640, 655–57 (7th Cir. 2008); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141–43 (2d Cir. 2005); *A.H. Robins*, 880 F.2d at 701.

Two factors from this bankruptcy debate show that these non-debtor releases do not arise from traditional equity principles—as they must to justify their expansion to this receivership context.  The first factor is the *timing* of the debate.  The practice of enjoining suits between non-debtors seems to have long been "considered improper" even in the bankruptcy context, and non-debtor releases have obtained a judicial foothold only in the last several decades.  Brubaker, *supra*, at 2, 30–33 (citing cases).  The relative recency of this innovation provides strong evidence that it lacks roots in "the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts."  *Gordon*, 295 U.S. at 36; *see Grupo*, 527 U.S. at 318–19.

The second factor is the *reasoning* in the debate.  Circuits on both sides recognize that only statutory authority—not any inherent equitable authority—can give bankruptcy courts the power to permit non-debtor releases.  Our opinion in *Dow Corning* provides a good example. That decision recognized that, as the bankruptcy court had explained, non-debtor releases were "unprecedented in traditional equity jurisprudence[.]"  280 F.3d at 657.  Yet we upheld their (limited) use in bankruptcy cases because Congress's enactment of § 105(a) meant that a

bankruptcy court was "not confined to traditional equity jurisprudence" and could rely on this "statutory grant of power" to justify the releases. *Id.* at 658. In this case's equity context, by contrast, we are bound by "historical practice" in administering receiverships, Fed. R. Civ. P. 66, and must limit ourselves to "traditional equity jurisprudence," *Dow Corning*, 280 F.3d at 657–58.

Indeed, the Supreme Court has already made this equity-vs.-bankruptcy distinction. In *Riehle*, it considered whether a receivership court must respect a prior state judgment against the debtor in its personal capacity. 279 U.S. at 223–24. Arguing that the court could reconsider the issues from the prior state case, the receiver cited lower-court decisions that permitted a court to disregard a judgment against a debtor under the bankruptcy laws. *Id.* at 227–28. The Court rejected this analogy, reasoning that these decisions had "no application to receiverships in a federal court sitting in equity, which lacks the power to stay an action in the state court." *Id.* at 228; *cf. Wm. Filene's Sons Co. v. Weed*, 245 U.S. 597, 601–02 (1918). This logic applies here.

Nor can our conclusion be disturbed by the Receiver's reliance on the Northern District of Ohio's Local Rule 66.1. As we noted, the governing rule requires receivers to administer equity receiverships in "accord with the historical practice in federal courts *or with a local rule*." Fed. R. Civ. P. 66 (emphasis added). The Northern District of Ohio has supplemented Rule 66 with a rule that requires a receiver to "administer the estate as nearly as may be in accordance with the practice in the administration of estates in bankruptcy[.]" N.D. Ohio Loc. Civ. R. 66.1(d). Even though we have read the bankruptcy laws to permit non-debtor releases in rare situations, *see Dow Corning*, 280 F.3d at 657–58, local rules may not modify substantive rights—such as the rights available to creditors under the historical practices of equity courts, 28 U.S.C. §§ 2071(a), 2072(b); *see Carver v. Bunch*, 946 F.2d 451, 453 (6th Cir. 1991); Fed. R. Civ. P. 83. We thus do not read this local rule as permitting receivership courts to grant non-debtor releases. *See Carver*, 946 F.2d at 453. The rule's text addresses the powers of a receiver, not the court. Besides, it requires the administration of a receivership estate to be "as nearly as" possible consistent with the administration of a bankruptcy estate. This language accounts for the possibility that a receiver might not possess all the powers of a bankruptcy trustee to the

extent that the bankruptcy laws have enlarged the trustee's powers beyond those that equity courts historically granted receivers.

Finally, the Receiver's "equitable" fairness arguments do not affect our reasoning. He rightly notes that Dream Center has a host of more significant liabilities, including those to its secured creditors, the federal government, and the employees whom it stiffed on medical bills. He adds that the Art Students have recovered much of their damages in a separate suit against the Department of Education, which forgave their student loans. And he points out that Dream Center's directors and officers and the Foundation would not have voluntarily given up any right to the insurance proceeds if they did not receive protection from third-party suits. He lastly highlights the "liquidation trust" that the district court set up to allow the Art Students to pursue their claims against the receivership estate rather than the non-receivership entities. In short, he characterizes the Art Students as lone "holdouts" with small claims seeking to prevent a resolution that fairly distributes the limited number of assets to all of the creditors.

For their part, however, the Art Students highlight "weighty" fairness "considerations" on the other side. *Grupo*, 527 U.S. at 330. The courts that generally permit non-debtor releases in the bankruptcy context caution that a court should grant this type of release "infrequently," *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011), because it is a "dramatic measure," *Dow Corning*, 280 F.3d at 658, that "lends itself to abuse," *Metromedia*, 416 F.3d at 142. And the Art Students identify what they claim to be concerning factors here. The Bar Order has effectively "operate[d] as a bankruptcy discharge" of the non-debtors without any of the "safeguards" for creditors that would apply if those parties were in bankruptcy or receivership proceedings themselves. *Id.* For example, as one factor to consider when approving a non-debtor release in the bankruptcy context, we have asked whether a "non-debtor has contributed substantial assets to the reorganization[.]" *Dow Corning*, 280 F.3d at 658. The Receiver identifies nothing that the directors and officers and the Foundation contributed other than the right to the insurance proceeds. As the Art Students also note, the Receiver has largely kept confidential Dream Center's purported claims against the directors and officers and the Foundation—the claims that form the entire basis of their settlement. In addition, we have also considered whether the approved plan gives parties who involuntarily give up their claims an

alternative right "to recover in full[.]" *Id.* The Art Students assert that the purported "litigation trust" provides an illusory remedy because its terms require them to have successfully prosecuted an independent claim and obtained a judgment against the directors and officers and the Foundation to recover anything—something that the Bar Order now permanently forecloses them from accomplishing.

In the end, we need not resolve the parties' fairness debate. *See Grupo*, 527 U.S. at 332. Their policy arguments over whether a receivership court should possess the "formidable power" to extinguish a creditor's claims against non-debtors "should be conducted and resolved where such issues belong in our democracy: in the Congress." *Id.* at 333. Perhaps the Receiver's arguments will eventually win the day and lead Congress to give equity courts this power. As the law stands today, however, traditional principles of equity still govern. And none of the Receiver's arguments permit "that which the law forbids." *Lloyd's*, 927 F.3d at 842 (citation omitted).

One last point. The parties frame this issue about whether the district court lawfully could enter the Bar Order in terms of its "jurisdiction." We have intentionally omitted that phrase. The parties do not mean subject-matter jurisdiction. All agree that the district court had diversity jurisdiction over this suit because Dream Center and Digital Media were citizens of different states and Digital Media's claim exceeded $75,000. 28 U.S.C. § 1332(a); *see Gordon*, 295 U.S. at 35–36. The parties are on stronger footing to the extent that they mean jurisdiction over the parties (personal jurisdiction) or the debtor's property (in rem jurisdiction). The district court lacked in rem jurisdiction over the non-debtor assets that its Bar Order covered. Yet the Art Students make no claim on appeal that it lacked personal jurisdiction to enter the Bar Order against them, since they had voluntarily appeared in the suit. We thus prefer to resolve this issue on "the merits" about whether a "court of equity" could have granted the type of relief that the district court provided. *Di Giovanni*, 296 U.S. at 69. The court could not do so because its Bar Order departed from "the accepted principles of equity[.]" *Gordon*, 295 U.S. at 36.

\*   \*   \*

We commend the district court and the Receiver for their diligent efforts in attempting to marshal limited assets to cover massive claims.  But those efforts did not comport with "historical practice[.]"  Fed. R. Civ. P. 66.  We thus reverse the district court's order approving the settlement and entering the Bar Order and remand for proceedings consistent with this opinion.